UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

WILLIAM I. MOTT,

                         Plaintiff,

  -against-

ERIC T. SCHNEIDERMAN, in his official
capacity as Attorney General of New York State; NEW
YORK STATE GAMING COMMISSION; MARK
GEARAN, in his official capacity as Chairman of the
New York State Gaming Commission; JOHN CROTTY,
PETER J. MOSCHETTI JR., JOHN J. POKLEMBA,
BARRY SAMPLE, and TODD R. SNYDER, in their
official capacities as Members of the New York State
Gaming Commission; ROB WILLIAMS, in his official
Capacity as Executive Director of the New York State
Gaming Commission, JOHN J. GOOGAS, in his
official capacity as coordinator for the New York State
Gaming Commission, STEPHEN LEWANDOWSKI,
in his official capacity as NYRA State Steward for the
New York State Gaming Commission; LEWIS
MELENDEZ, in his official capacity as hearing officer
For the New York State Gaming Commission; NEW
YORK DRUG TESTING AND RESEARCH PROGRAM
AT SUNY MORRISVILLE and GEORGE A. MAYLIN,
D.V.M., PHD, in his official capacity as program director,
for the New York State Gaming Commission.

                         Defendants
-------------------------------------------------------------x

**CV-15 2290**

COMPLAINT

Civil Action No._____

COMPLAINT FOR
DECLARATORY INJUNCTIVE,
OR OTHER RELIEF

**FEUERSTEIN, J**

BROWN, M. J.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   APR 22 2015   ★

LONG ISLAND OFFICE

Plaintiff, WILLIAM I. MOTT, by and through his attorney **Andrew J. Mollica**, by way

of a Complaint against New York State Gaming Commission, Mark Gearan, Chairman; John

Crotty, Peter J. Moschetti Jr., John J. Poklemba, Barry Sample, And Todd R. Snyder, Members;

Rob Williams, Executive Director, John J. Googas, Stephen Lewandowski, State Steward; Lewis

1

Melendez, hearing officer, New York Drug Testing And Research Program at SUNY Morrisville and George A. Maylin, D.V.M., PhD, Program Director, hereby avers as follows:

## PRELIMINARY STATEMENT

1.      This is an action for injunctive and declaratory relief brought pursuant to 42 U.S.C. §1983 arising from Defendants' actions taken under color of State law, which have unlawfully deprived Plaintiff, William I. Mott (hereinafter referred to as "Mr. Mott"), and continue to deprive Mr. Mott, of his Constitutionally protected property interests, including Mr. Mott's right to rely upon and utilize the state occupational racing license duly issued to him without limitations by the New York State Gaming Commission ("Commission"), which license is presently extant, in order to pursue his chosen profession and make a livelihood as a thoroughbred racehorse trainer, and his Constitutionally protected liberty interest, including his reputation as a respected Hall of Fame horse trainer, which has developed since the New York State Racing and Wagering Board (forerunner to the Commission) issue his initial license in or about 1982 without due process of law in violation of the Fourteenth Amendment of the United States Constitution.

2.      The gravamen of this complaint is that Mr. Mott has been violated under Commission regulations, fined and suspended by the Commission for an alleged overage of two legitimate therapeutic medications purported to have been determined by analysis of a post-race blood sample extracted from a thoroughbred racehorse that competed under Mr. Mott's care, custody and control. Mr. Mott vehemently denies any violation, intentional, negligent or otherwise, of the medication rules of the Commission.

3.      Upon his appeal of the violation, fine and suspension, Mr. Mott sought, was approved by Commission officials, and paid to have a split (referee) sample of the blood sample sent to a Commission-approved independent referee laboratory.

4.      Rather than send a blood sample to the referee laboratory, the Commission officials forwarded only a urine sample; a sample completely useless to serve as a referee sample, given that only the quantitative levels allegedly found in the post-race blood sample served as the basis upon which Mr. Mott received his violation, and that analysis of urine can only exhibit the presence of the legitimate therapeutic medications in the horse on race day; not the levels of those medications. In essence, the denial of a split blood sample for referee analysis eliminates any possibility for Mr. Mott to exonerate himself, and otherwise denies him the substantive right to due process in his appeal.

5.      The denial of a split sample of blood for referee analysis by Commission officials is not only a violation of Mr. Mott's constitutionally-guaranteed due process and property rights; it is also the latest example of Commission officials' denying appropriate referee (split) samples to other respondents charged similarly.

6.      In this action, Mr. Mott seeks a declaration pursuant to 28 U.S.C. 2201 et sec., that (a) Defendants are each prohibited from fining Mr. Mott and/or suspending or revoking his license based upon the charges against him which are detailed in this complaint; b) entry of a preliminary and permanent injunction enjoining each of the Defendants from further proceedings in this matter, including but not limited to the conducting of a Commission hearing scheduled to be held on May 6, 2015, and; c) an order vacating the issued Steward's Ruling more fully described below.

3

7.      If Defendants are not immediately enjoined, and continue to be enjoined while this suit is pending, Mr. Mott will suffer immediate and ongoing irreparable harm.

## JURISDICTION

8.      This Court has jurisdiction over this matter pursuant to its original jurisdiction as set forth in 28 U.S.C. §1331 and §1343, and 42 U.S.C. §1983 in that Mr. Mott alleges a violation of his rights under the Fourteenth Amendment and Fifth Amendment to the United States Constitution by a person acting under the color of State law. This is a civil action seeking relief to protect the rights guaranteed to Mr. Mott by the Constitution of the United States.

9.      This Court has supplemental jurisdiction over Mr. Mott's state and common law claims by virtue of the provisions of 28 U.S.C. §1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper in this District under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Mr. Mott's claims, set forth herein, have occurred and continue to occur within this District.

## PARTIES

11.     Since at least 1982, Plaintiff WILLIAM I. MOTT has been a professional thoroughbred horse trainer duly licensed by the New York State Gaming Commission and its predecessor agency, the New York State Racing and Wagering Board.

12.     The United States Supreme Court has held that an occupational trainer licensee possesses a property interest in his or her license under state law sufficient to invoke due process protections ( Barry v. Barchi, 443 U.S. 55 (1979).

13.   Mr. Mott's sole, lifelong profession is that of a trainer of thoroughbred racehorses.

14.   In 1998, Mr. Mott was inducted into the National Thoroughbred Hall of Fame at the age of 45, the youngest trainer ever to receive such honor.

15.   Mr. Mott received the 1995, 1996 and 2011 Eclipse Award as the nation's outstanding thoroughbred trainer.

16.   Additionally, Mr. Mott was the 1995, 1996 and 2000 recipient of the New York Turf Writers Outstanding Trainer Award.

17.   In 1996, Mr. Mott was the recipient of the "Big Sport of Turfdom" Award given by the Turf Publicists of America.

18.   Thoroughbred racehorses under Mr. Mott's tutelage have competed at the highest levels of worldwide thoroughbred racing, including but not limited to the Kentucky Derby, The Preakness Stakes, The Belmont Stakes each being an event that constitutes on leg of the American "Triple Crown"; Breeders' Cup races and the Dubai World Cup.

19.   Mr. Mott's trainee, *Drosselmeyer*, won the 2010 Belmont Stakes and the 2011 Breeders' Cup Classic.

20.   Mr. Mott also trained the 1995 Horse of the Year, *Cigar*.

21.   Since 1992, Mr. Mott has either won or tied for leading trainer at a New York race meet at least 19 times

22.   Mr. Mott's horses have won hundreds of stakes races, and is widely thought to be the top thoroughbred trainers in the world.

23.   In over thirty years as a licensed thoroughbred trainer, Mr. Mott has never received a positive test for an illicit substance in a horse.

5

24.     Prior to the instant matter, in a career spanning nearly forty years, Mr. Mott received only two positive tests for therapeutic medication overages. In 2002, Mr. Mott received a $1,000 fine and seven (7) day suspension for a lidocaine overage in a horse. Mr. Mott used a topical ointment, Neosporin Plus, to treat a skin infection in a horse. Mr. Mott was under the impression that the amount of lidocaine in the topical was so minute as to be completely benign. Early in Mr. Mott's career, in or about 1982, a horse under Mr. Mott's care, custody and control experienced an antihistamine overage, likely caused by a veterinary dosage error.

25.     Other than the foregoing incidents, Mr. Mott has a spotless record with regard to the use and administration of therapeutic medication in the thousands of thoroughbred racehorses he has trained that have competed in tens of thousands of pari-mutuel races worldwide.

26.     Mr. Mott is a resident of Malta, New York.

27.     At all times hereinafter mentioned, ERIC T. SCHNEIDERMAN is the Attorney General of the State of New York. In his official capacity, the Attorney General is the chief legal officer of the State of New York, and is duty bound to see that state law is uniformly and adequately enforced, and that the state administrative regulation comport with law an the Constitution.

28.     Defendant, NEW YORK GAMING COMMISSION (the "Commission") is an instrumentality of the State of New York and a public agency created by Section 102 of the New York Racing, Pari-Mutuel Wagering and Breeding Law. The Commission is charged with the administration of all gaming activities in the state, including but not limited to the regulation of all occupational  racing licenses and licensees; the conduct of investigations and hearings and the hearings concerning licensees and the, suspension, revocation and renewal of all occupational licenses. (See; New York Racing, Pari-Mutuel Wagering and Breeding Law Section 104).

29.     At all relevant times herein, Defendant, MARK GEARAN, was and is the Chairman of the Commission and, upon information and belief, a resident of the State of New York.

30.     At all relevant times herein, Defendants, JOHN CROTTY, PETER J. MOSCHETTI JR., JOHN J. POKLEMBA, BARRY SAMPLE, and TODD R. SNYDER, in theie official capacities, were and are members of the Commission and upon information and belief, all residents of the State of New York.

31.     At all relevant times herein, Defendant, ROB WILLIAMS, in his official capacity, was and is upon information and belief, a resident of the State of New York, was and is the Executive Director of the Commission.

32.     Upon information and belief, at all relevant times herein, Defendant, JOHN J. GOOGAS, was and is, upon information and belief, a resident of the State of New York, an employee of the Commission charged with the coordination and logistics of sample collection and/or sample allocation among the parties requesting independent, split sample (referee) testing, Defendants, NEW YORK DRUG TESTING and RESEARCH PROGRAM AT SUNY MORRISVILLE (Morrisville State College) and DR.GEORGE MAYLIN, DVM., PHD, and the selected independent testing laboratory.

33.     At all relevant times herein, Defendant, STEPHEN LEWANDOWSKI, was and is upon information and belief, a resident of the State of New York, in his official capacity was and is the Commission appointed state steward at the relevant race meet and the official who issued the fine and suspension against Mr. Mott which is a subject of this lawsuit.

34.     At all relevant times herein, Defendant, LEWIS MELENDEZ, was and is, upon information and belief, a resident of the State of New York, in his official capacity, was and the

hearing officer duly appointed by the Commission to conduct the scheduled hearing of Mr. Mott's appeal of the imposed violation, fine and suspension.

35.     At all relevant times herein, Defendant, NEW YORK DRUG TESTING and RESEARCH PROGRAM AT SUNY MORRISVILLE (Morrisville State College) (the "Program") was and is the state contract testing laboratory for all racehorse specimens in the State, so designated by the Commission pursuant to New York Pari-Mutuel Racing, Wagering and Breeding Law Section 902(1), and the laboratory which conducted the analysis of blood and urine samples which are a subject of this lawsuit.[1]

36.     Upon information and belief, Defendant, NEW YORK DRUG TESTING AND RESEARCH PROGRAM, ("Defendant Program") was and is at all relevant times located at and operated by Morrisville State College.

37.     At all times herein, Defendant, GEORGE A. MAYLIN, , D.V.M., PHD was and is, upon information and belief a resident of the State of New York, is the director of Defendant New York Drug Testing and Research Program at Morrisville State College and the individual responsible for and entrusted by the Commission to conduct the analysis of the blood and urine samples which are the subject of this lawsuit, and for the preservation of blood samples, including the one which is a subject of this lawsuit, for the purpose of split sample (referee) testing. Further, Dr. Maylin has testified at virtually every medication and drug violation hearing held before the Commission and its predecessor during the past several decades as the Commission's expert witness, and is tantamount to being the Commission's chief chemist.

_____

[1] Until recently, the Program was situated at Cornell University. An amendment in the applicable New York statute (Racing, Pari-Mutuel Wagering and Breeding Law § 902(1) changed mandated equine drug testing at race meetings from being conducted by a land grant university within this state with a regents approved veterinary college facility (Cornell) to a state college equine science program (SUNY Morrisville). See Chapter 15, Laws of 2010.

## FACTS

38.     During the month of September 2014, Mr. Mott was the trainer entrusted with the care, custody and control of the thoroughbred racehorse Saratoga Snacks for the horse's owner, August Dawn Farm.

39.     During the month of September 2014, Mr. Mott entered Saratoga Snacks to compete in the 4th pari-mutuel race on September 20, 2014 to be conducted at Belmont Park, located in Nassau County, New York.

40.     Belmont Park is a world class thoroughbred racing facility owned by the State of New York and operated by the New York Racing Association, Inc. ("NYRA").

41.     At all relevant times herein, NYRA was and is an instrumentality of the State of New York, with 12 of its 17 "reorganization" board members appointed by the State government.[2]

42.     The therapeutic medication "flunixin" (trade name "Banamine®") is a Non-steroidal Anti-inflammatory drug (NSAID) used to treat minor muscular inflammation in horses.

43.     By regulation of the Commission[3], in September 2014 the therapeutic medication flunixin was permitted to be administered to thoroughbred racehorses in New York, provided that the medication is given at least 24 hours before the scheduled post time of the race in which the horse is to compete.

44.     The administration of flunixin is performed by the private veterinarian of a trainer.

---

[2] The temporary state takeover of NYRA was statutorily accomplished via the New York state racing franchise accountability and transparency act of 2012, Chapter 457 Laws of 2012.

[3] 9 NYCRR 4043.2 (d); amended subsequent to September 2014.

45.     It is not a violation for a horse to race with flunixin in its system; rather, it is a violation for a horse to race with flunixin in its system, in excess of an unpublicized threshold[4] amount of the medication that purportedly comports with the 24 hour withdrawal time of the medication.

46.     The scheduled post time for the 4th race at Belmont Park on September 20, 2014 was 2:38 p.m. See Exhibit "A".

47.     The therapeutic medication "furosemide" (trade names "Lasix®" and "Salix®") is a diuretic used to treat and/or prevent a common equine condition known as Exercised Induced Pulmonary Hemorrhage (EIPH), or the bursting of capillaries in the lungs during exertion.

48.     By regulation of the Commission[5], the therapeutic medication furosemide is permitted to be administered to thoroughbred racehorses in New York, provided that the medication is given between 4 and 4 ½ hours before the scheduled post time of the race in which the horse is to compete.

49.     Unlike flunixin, the administration of furosemide is conducted by a veterinarian employed by NYRA, and not by the trainer's private veterinarian, to horses qualifying to receive the medication.

50.     At the trainer's request and direction, an eligible horse receives a single intravenous (IV) injection of no less than 150 milligrams (3cc) and no more than 500 milligrams (10cc) of the medication within the permitted time window.

---

[4] Per Se threshold amounts for the two medications were published effective January 1, 2015 at 9 NYCRR 4043.3. See, also Important Thoroughbred Horsemen, Vet and Owner Notice; New York State Gaming Commission, December 3, 2014. Last read online April 10, 2015 at http://gaming.ny.gov/pdf/12.03.14.EMD_Notice.pdf

[5] 9 NYCRR 4043.2 (b)

51.     It is not a violation for a horse to race with furosemide in its system; rather, it is a violation for a horse to race with furosemide in its system in excess of an unpublicized threshold amount of the medication that purportedly comports with the withdrawal time of the medication.

52.     On September 19, 2014, Mr. Mott's private veterinarian, Dr. James Hunt, administered the customary 500 milligram dose of flunixin to *Saratoga Snacks* at 9:50 a.m. See Exhibit "B".

53.     This administration occurred over 29½ hours before the 2:38 p.m. scheduled post time for the 4th race on September 20, 2014; a period several hours before the mandated withdrawal time for the medication.

54.     Further, Mr. Mott directed the NYRA veterinarian to administer only 150 milligrams (3cc) of the medication furosemide to *Saratoga Snacks*, despite the fact that Commission regulations permitted him to ask for up to 500 milligrams (10cc) of the medication to be administered. See (Exhibit "C"..

55.     Except as stated above, no one at the direction of or with the knowledge of plaintiff Mott ever administered either flunixin or furosemide to *Saratoga Snacks* at any time on September 19 or September 20.

56.     In sum, plaintiff Mott, his employees and agents, followed all mandatory regulatory protocols with regard to the administration of flunixin and furosemide.

57.     *Saratoga Snacks* competed in the 4th race on September 20, 2014. See Exhibit "D".

58.     The stewards at a race meeting have the power to direct specimen collection for any horse that competes at that race meeting.

59.     At the direction of the stewards, *Saratoga Snacks* was sent to the state test barn at Belmont Park for the purpose of specimen collection.

60.     Upon information and belief, state officials at the state test barn collected blood and urine samples from *Saratoga Snacks*.

61.     Upon information and belief, those samples were sent to Defendant NEW YORK DRUG TESTING and RESEARCH PROGRAM under the direction of Defendant GEORGE A. MAYLIN, D.V.M., PHD, Program Director.

62.     On or about October 9, 2014, Defendant Maylin reported to Defendant, JOHN J. GOOGAS  of the Commission certain concentrations of the flunixin and furosemide allegedly contained in the post-race blood (plasma) specimen allegedly collected from *Saratoga Snacks*. See Exhibit "E".

63.     While Defendant Maylin reported that the post-race urine sample allegedly collected from *Saratoga Snacks* contained flunixin and furosemide, no therapeutic overage levels of the medications in the urine were reported.

64.     On or about January 23, 2015, Defendant STEPHEN LEWANDOWSKI, the Commission-appointed State Steward at the NYRA racetracks, notified Mr. Mott the he was suspended for 15 days and fined the sum of $1,000 for "… the finding of the drug Flunixin and an overage of the drug Furosemide in the body fluid from the horse *Saratoga Snacks* who finished 6th in the 4th on September 20, 2014." ("Steward's Ruling") See Exhibit "F".

65.     By letter from his counsel on January 23, 2015, Mr. Mott immediately appealed the Steward's Ruling. See Exhibit "G".

66.     Prior to the issuance of the Steward's Ruling, and specifically on or about November 14, 2014, Mr. Mott filed a "Request for Independent Testing" with the Commission. See Exhibit "H".

67.     In his Request for Independent Testing, Mr. Mott designated the Louisiana State University School of Veterinary Medicine ("LSU") as the independent lab to conduct the referee analysis.

68.     By correspondence dated November 18, 2014, Defendant Googas directed Defendant Maylin to ship the "remaining untested sample" to Dr. Stephen A. Barker at LSU. See Exhibit "I".

69.     Dr. Barker is a full professor in the Department of Comparative Biomedical Sciences at LSU.

70.     Significantly, since 1987 Dr. Barker has served as the Director of the Equine Medication Surveillance Laboratory ("EMSL"), the official drug testing laboratory for the Louisiana State Racing Commission ("LSRC") and as the State Chemist to the LSRC, offering testimony as the State's expert in hundreds of equine drug positive cases.

71.     In effect, Dr. Barker's role in Louisiana is equivalent to that of Defendant Maylin in New York; both are the chief regulatory chemist for their state's respective racing commissions.

72.     In accordance with the requirement of the Commission, Mr. Mott paid LSU for the costs of the sample analysis.

73.     Attached as Exhibit "J" is the affidavit of Dr. Barker of LSU.

74.     In the affidavit, Dr. Barker explains that he received from Defendant Maylin only a urine sample, and not a blood sample for *Saratoga Snacks*.

75.     Dr. Barker states that during the process he received a telephone call from Defendant Googas, and that Googas, informed Barker that there was no blood sample left and that he called, due to "…our past problems with being provided sufficient blood sample", to ask if Barker would accept the urine samples for analysis.

76.     Barker indicates that Googas was aware that on several other occasions Barker was unable to conduct plasma analysis and confirmation of drugs in New York racing samples because the New York laboratory had depleted all or almost all (leaving less than 0.5 ml, of the sample in conducting their analysis, and that this has been a recurrent and ongoing problem.

77.     Barker explains that during the calendar year of 2014 he experienced four occasions (out of 5 submissions, including the present case) where he was unable to conduct plasma analysis due to the failure of the New York laboratory to provide or preserve sufficient sample for analysis.

78.     Further, Barker states that during, 2013 LSU could not conduct requested blood analysis because of insufficient sample and several occasions (5 submissions out of 6) occasions LSU was forced to alter its protocols to address the small amount of sample submitted.

79.     Dr. Barker indicates that while, like Defendant Maylin, he found the PRESENCE of flunixin and furosemide in the urine sample, confirmation of the presence of the two compounds in question in urine has no bearing on the plasma results reported by the New York lab.

80.     As explained by Dr. Barker, a confirmation of the presence of these two compounds in urine is not a confirmation of the plasma results on which the positive results in this case are wholly based.

81.     Dr. Barker further makes clear that both flunixin and furosemide are regulated in the New York rules of racing based on the concentrations observed versus the thresholds established <u>in plasma</u>, and that the mere presence of these compounds in urine, which is all the EMSL confirmed, does not support and cannot be construed to support the concentrations reported by the New York laboratory in plasma.

82.     In sum, the mere presence of flunixin and furosemide in urine, which is all the EMSL data show, is not a violation.

83.     In fact, given the admitted administrations of these therapeutic medications in accordance with Commission regulations, the presence of the medications at some level is not surprising; rather, it is completely predictable.

84.     In a word, the presence of flunixin and furosemide in the urine specimen is irrelevant.

85.     Urine admittedly has a place in racehorse drug testing, for example, where a drug is not permitted in any quantity in a racehorse ("zero tolerance" drugs), their presence in even a trace amount in urine would trigger a violation.

86.     Unlike opiates or amphetamines, however, neither flunixin nor furosemide is a zero tolerance drugs. Rather, each is a legitimate therapeutic medication permitted to be given before a race for which there are established, albeit unpublicized, thresholds.

87.     Inasmuch as no blood sample was forwarded to Dr. Barker for analysis, and the Ruling is based entirely upon concentrations in the blood purportedly in excess of the respective medications' thresholds, plaintiff Mott was not afforded the opportunity to exonerate himself.

88.     The failure to provide Dr. Barker with a blood sample for *Saratoga Snacks* severely prejudices Mr. Mott. While elaborate scientific screening tests and confirmations of the

blood specimen were allegedly conducted by Defendants, the only way to confirm the levels in the blood reported by Defendants NEW YORK DRUG TESTING and RESEARCH PROGRAM AT SUNY MORRISVILLE (Morrisville State College) and GEORGE A.MAYLIN, D.V.M., PHD, Program Director, is to conduct an independent analysis of the blood by providing a referee (split) sample. That simply was not done here.

89.     The submission of a blood sample to the independent lab would have served another critical purpose. Mr. Mott would have ordered Dr. Barker to conduct Deoxyribonucleic acid (DNA) testing to ensure that the blood specimen upon which the violation was solely based was actually a specimen extracted from *Saratoga Snacks*. Because the violation was based upon a purported excess in threshold levels of the medications present in the blood specimen, DNA testing of the separate urine specimen would be of no consequence.

90.     Further, while failure to provide an appropriate referee sample in any instance constitutes a due process violation, the specific facts of this matter highlight the due process deprivation.

91.     Flunixin and furosemide are administered under different regulatory protocols, at different times and by different veterinarians; one private, and one under the control of the association conducting racing at the facility.

92.     A positive test (,i.e one which alleges a medication overage as described herein), could conceivably result from veterinary error for which the trainer may regrettably be responsible.

93.     It is, however, virtually unfathomable that a horse could exhibit positive for BOTH medications in the same instance. A search of the Commission's own Ruling Database by counsel, could find no similar alleged violations for at least the past five (5) years.

94.     9 NYCRR 4043.4, known as the "Trainer Responsibility Rule", reads in pertinent part as follows:

> (a) A trainer shall be responsible at all times for the condition of all horses trained by him or her. No trainer shall start or permit a horse in his or her custody, care or control to be started if the trainer knows, or might have known or have cause to believe, that the horse has received any drug or other restricted substance that could result in a positive test. The trainer shall be held responsible for any positive test unless the trainer can show by substantial evidence that neither the trainer nor any employee nor agent was responsible for the administration of the drug or other restricted substance. Every trainer must guard each horse trained by him or her in such manner and for such period of time prior to racing the horse so as to prevent any person, whether or not employed by or connected with the owner or trainer, from administering any drug or other restricted substance to such horse contrary to this Part.

95.     The Trainer Responsibility Rule establishes a rebuttable presumption that a trainer is responsible for a positive test.

96.     By denying Mr. Mott the right to a meaningful independent test (i.e. referee analysis of the blood sample), the Commission has forced upon Mr. Mott a virtual, "irrebuttable" presumption in contravention of its own rule.

97.     By denying Mr. Mott's selected independent laboratory the ability to subject to analysis the very specimen upon which he was found to have violated the medication rules of the Commission, the Commission has effectively negated Mr. Mott's ability to establish, by substantial evidence, that no excessive medication existed in the horse.

98.     Further, it is clear that Defendants have engaged in a consistent and intentional course of conduct by failing to collect and/or preserve sufficient blood specimens to be used for independent referee analysis.

99.     As early as 1991, the New York courts were giving the New York State Racing and Wagering Board, the forerunner to the Commission, the benefit of the doubt, holding that a trainer is not denied due process absent an allegation and proof that the Racing Board's failure to preserve a sufficient blood sample to permit an independent test was intentional, and thus in bad faith. *DeBonis v. Corbisiero*, 178 A.D.2d 183 (First Department, 1991); *DeBonis v. Corbisiero*, 169 A.D.2d 390, (First Department, 1991), lv denied 78 N.Y.2d 852.

100.    Now, over twenty years later, Commission officials have used these holdings as license to infringe upon the due process rights of licensees.

101.    As the Barker affidavit clearly delineates, over the course of just the last two years in the overwhelming majority of referee cases in New York where the licensee designated LSU as the referee laboratory, New York officials either sent no blood specimen or a blood specimen insufficient in quantity to conduct proper analysis.

102.    Such a pattern of conduct demonstrates an intentional effort on the part of the Defendants to insulate Defendant Maylin and his Defendant Program from independent, objective scientific scrutiny.

103.    The Commission's failure to provide meaningful split sample collection and referee testing creates a wholly unfair process for the adjudication of a suspected violation.

104.    The Commission's 2013 Annual Report, the latest one published, discusses the protocols in place when a medication or drug positive is called by Defendant Program. The report states that in the event of a positive test; "The trainer is afforded the option of having a "split" sample of the original tested at an approved laboratory of his/her choice at his/her expense."[6]

---

[6] Page 13; 2013 Annual Report of New York State Gaming Commission. Last read on line April 8, 2015 at http://gaming.ny.gov/pdf/GamingAnnualReport_2013_072114.pdf

105.    When the original tested sample upon which the violation is not sent or is sent in insufficient quantity to the approved laboratory, the New York Commission does not cause the collection of a "split" sample.

106.    Rather than "split" specimens into two samples at the time and place of collection, reserving one specifically for referee analysis, the Commission collects a single blood (plasma) and urine sample, ships both collected samples to Defendants Program and Defendant Maylin, who, "use up" the blood sample collected to the extent that there is either no blood or insufficient blood left for proper referee analysis.

107.    In fact, and despite the public pronouncement contained in the Commission's 2013 Annual Report, Defendant Commission's procedures do not afford the right to a split sample, or even referee testing.

108.    There is neither statutory nor administrative protocol mandating or affording accused licensees the right to split sample collection, sample preservation, or even referee testing.

109.    In effect, Defendants take the position that referee testing is a matter of grace. A trainer accused of a violation gets an independent test provided that there is enough specimen left over after Defendant Commission's testing, there is more often than not no blood specimen, the only specimen upon which most violations are based, left over.

110.    In New York, there is virtually no due process right afforded by the Defendants to the suspected licensee, including presently Mr. Mott, in a medication or drug violation matter.

111.    While the licensee is presumptively afforded a pre-violation "stewards' (judges) hearing": that hearing involves little more than the assessment of a penalty by the state steward (judge) who presides at the race meet. The "decision" as to guilt is presumed by virtue of the test

result reports sent to the stewards by the Commission based in Schenectady, coupled with the presumption contained in the Trainer's Responsibility Rule.

112.    The "hearing" on appeal of the Steward's Ruling involves the testimony before a Commission-designated (not independent) hearing officer of Defendant Maylin, who has continuously served as the state's regulatory chemist since at least 1970; the introduction of his reports; and the Commission counsel's introduction of relevant regulations and the respondent trainer's penalty history. The trainer is then afforded the "opportunity" to rebut the findings, armed without any ability to exhibit his or her innocence based upon split sample analysis.

113.    In this regard, Defendants are the clear outliers, as virtually every other racing jurisdiction in the county provides some type of mandated regulatory protocol for split sample collection and testing.[7]

114.    Other states provide for split sample collection (sometimes referred to as "primary" and "secondary" samples) to be performed at the collection site (test barn); provide for the, segregation, storage, and security of the split sample, and further provide for the referee procedure and disposition of the alleged "positive" upon the event the a "negative" finding by the referee laboratory.

---

[7] New Jersey: N.J.A.C. 13:70-14A.4
Massachusetts: 205 CMR 4.55
Pennsylvania: 58 Pa. Code §163.318
Kentucky: 810 KAR 1:018§§ 11-13
California: California Horse Racing Board Rule No. 1859.25
Indiana: 71 IAC 8.5-3-1
Nebraska: Nebraska State Racing Commission Regulation 14.010
Florida: Florida Statute 550.2415.5
Illinois:  11 Illinois Administrative Code §603.120
Maine: Maine Harness Racing Commission Rules, Chapter 11,  §§ 5; 7
Delaware (Thoroughbred): Delaware Administrative Code Title 3: 1001: 15.10.6; 15.10.6.11.3
Delaware (Harness): Delaware Administrative Code Title 3: 501: 8.4.2; 8.4.3.5.10.3
Louisiana: Louisiana Administrative Code Title 35,  §1775
Virginia: 11 VAC 10-180-100; 110
West Virginia: WV 178 CSR-1-50

115.   By way of example, Pennsylvania regulations require in pertinent part that urine or blood sample secured shall be split into two parts; that, "Blood samples shall initially be taken in a quantity to insure that ample portions shall be obtained."; that, "Upon application by the trainer or owner of the horse in question, the split portion of the sample taken shall be tested by a laboratory designated by the Commission and approved by the Horsemen's Benevolent and Protective Association."; and that, "If the test of the split portion does not substantially confirm the findings of the original laboratory, the Commission will not consider the sample to constitute a prima facie violation of this chapter and no penalty will be imposed."[8]

116.   The importance of split specimen collection and referee testing in Pennsylvania was no better stated that by a judge who, upon finding that an employee of the State destroyed a split sample, albeit in a good faith belief that the sample may have been contaminated, reversed the State Horse Racing Commission and vacated the penalty assessed against a licensee for an NSAID (Phenylbutazone) overage:

> The opportunity for two analyses of the sample is of great importance in the instant matter. "Bute" is not an illegal substance, per se, but is classified as being of "therapeutic value" by the Racing Commission. However, the dosage, at the time in question, was not allowed to exceed two micrograms per milliliter of plasma. Since we are dealing with finite amounts, an opportunity to obtain an independent, quantitative analysis as provided for the rules of racing is critical.[9]

117.   As a further example, Kentucky regulations provide in pertinent part that "The commission veterinarian shall determine a minimum sample requirement for the commission laboratory which shall be uniform for each horse and which shall be separated into primary and

---

[8] Pennsylvania: 58 Pa. Code §163.318(b); (b)(2); (c); (d)(1)

[9] *Delaney v. State Horse Racing Commission*, 112 Pa. Commonwealth Ct. 407, 535 A.2d 719 (Commonwealth Court of Pennsylvania, 1988, Collins, J.)

split sample"; and further provide for mandatory procedures regarding storage, shipment and chain of custody of split samples.[10]

118.    In Florida, the split sample regulation is drafted so as to ensure the due process rights of the licensee, as well as to ensure the protection of the public as to integrity of the split sample at the time of referee testing: "If the state laboratory's findings are not confirmed by the independent laboratory, no further administrative or disciplinary action under this section may be pursued. The division may adopt rules identifying substances that diminish in a blood or urine sample due to passage of time and that must be taken into account in applying this section." [11]

119.    California racing regulations also provide due process for the licensee by striking an appropriate balance: "If the findings by the independent Board-approved laboratory fail to confirm the findings of the prohibited drug substance as reported by the official laboratory, it shall be presumed that the prohibited drug substance was not present in the official sample."[12]

120.    Both Delaware thoroughbred and harness (standardbred) regulations provide a reasonable use of a negative referee laboratory result as part of their respective "secondary" sample protocols: "If the finding of the referee laboratory is proven to be of sufficient reliability and does not confirm the finding of the initial test performed by the Commission chemist and in the absence of other independent proof of the administration of a prohibited drug to the horse in question, it shall be concluded that there is insubstantial evidence upon which to charge anyone with a violation."[13]

---

[10] Kentucky: 810 KAR 1:018§§ 11(2); 12; 13

[11] Florida Statute 550.2415.5(b)

[12] California Horse Racing Board Rule No. 1859.25(d)(1)

[13] Delaware Administrative Code Title 3: 1001: 15.10.6.11.3 (Thoroughbred)
Delaware Administrative Code Title 3: 501: 8.4.3.5.10.3(Harness)

121.     West Virginia's racing regulators contemplate exoneration via referee testing in circumstances where, as here, what is in question is not the presence of an illicit drug, but rather whether a permissible medication's threshold has been exceeded: "No action shall be taken against the trainer or owner if the results of the split sample testing are negative or, in the instance of qualitative levels of permitted medications, where the confirmed levels are with the permitted levels." [14]

122.     Defendants' failure to provide Plaintiff Mott with due process regarding split sampling and testing is not only out of step with virtually all other racing jurisdictions; it is also contrary to the Model Rules established by the Association of Racing Commissioners International ("ARCI"). [15]

123.     The circumstance is ironic, given that Defendant ROB WILLIAMS, Commission Executive Director, is presently a voting member of ARCI's Board of Directors, and previous members and officers of ARCI have been New York racing regulators.

124.     In an attempt to obtain information regarding the failure of the Commission to collect and preserve blood samples for referee testing, plaintiff Mott caused his attorney to forward a discovery demand to the Commission. See Exhibit "K."

125.     The demand requested, inter alia, information pertaining to the size and capacity of the test tubes utilized in the collection process; written protocols regarding collection and specimen amounts; information regarding changes in collection protocol and procedure; information regarding the amount and disposition of blood samples during the Defendants' testing process; notes and memoranda with regard to conversations between Defendant Googas

---

[14] West Virginia: WV 178 CSR-1-50.5q

[15] ARCI-025-023 B.; C.; E. – last read online at  http://ua-rtip.org/sites/ua-rtip.org/files/Chapter%2025%20-%20Equine%20Veterinary%20Practices,%20Health%20and%20Medication_1.pdf

and Dr. Barker regarding referee blood specimens; and the identity of other laboratories engaged in referee testing.

126. The demand was met with the terse response that, "disclosure is only required of the Commission when a hearing involves a license revocation and in such cases is limited to evidence, including documentary, identity of witnesses, etc. that the agency plans to use at the hearing." See Exhibit "L"

127. Thus, while the Commission released an investigator's report and voluntary statement of Plaintiff Mott's employee, it refused to provide even the scantest of information regarding its blood collection protocols or even the disposition of blood in the instant matter.

128. Even the Commission's self-serving discovery rules violate due process, as they obligate the Commission's counsel to disclose only what it deems material and relevant, without the slightest regard for the genuine and valid defenses of respondent Plaintiff Mott with regard to the central issues involving the alleged violation; i.e. the Commission's specimen collection and testing protocols.

129. Of all individuals, Defendants, acting under color of law, should know better.

130. In New York alone, horses trained by Mr. Mott earned over $11,700,000 in purse in just calendar year 2013.

131. Moreover, as the regulators of not just racing, but all gaming that lawfully takes place within the state, the Commission Defendants are uniquely and actually aware that the establishment of Video Lottery Terminal (VLT) gaming at NYRA's Aqueduct Racetrack by the New York State legislature[16] has significantly enhanced the purse structure at the NYRA racetracks (Aqueduct Racetrack; Belmont Park Racetrack; Saratoga Race Course), making New

---

[16] New York Tax Law §§ 1612; 1617-a

York what was arguably one of the most lucrative thoroughbred venues in the world even more so lucrative..

## COUNT I
### (Preliminary and Permanent Injunction)

132.    Mr. Mott repeats and realleges the allegations in Paragraphs 1 through 131 of this Complaint as if set forth fully at length herein.

133.    Despite the fact that Mr. Mott has been afforded a date for an appeal hearing by the Commission Defendants, Mr. Mott is being denied a hearing with even the scintilla of due process.

134.    A due process hearing must, by law, be a meaningful hearing. While state regulation might lawfully presume guilt of a respondent in an administrative proceeding, denying respondent, the plaintiff herein, the opportunity to mount a valid defense to the alleged violation that such hearing, is tantamount to no hearing at all.

135.    Due process requires that Mr. Mott have the right to develop substantial evidence to rebut the Trainer Responsibility Rule presumption. Without an appropriate split specimen / referee test, Mr. Mott has been denied the opportunity to exonerate himself. In this regard, the availability of the urine sample is mere window dressing, calculated to impede a clear view of the lack of protocols which would serve to protect Mr. Mott and other accused licensees from an unjust accusation.

136.    Threshold enforcement is not a question of the medication being present in a horse's system or not. Neither flunixin nor furosemide are dangerous zero tolerance drugs. Rather, each was more than likely present in some amount in the system of *Saratoga Snacks* at post time, as both therapeutics were admittedly administered in accordance with Commission regulations.

137.    Thus, the only relevant question is: At what amounts were the medications present in the horse's system? Thresholds establish "Cinderella-type" enforcement. A finding under the threshold is not a violation; a finding over the threshold is a violation. Without split sampling and referee testing of blood; the medium by which the violation was calculated and called, the Commission is simply saying, "Trust us, you lose."

138.    Mr. Mott will likely succeed on the merits of his claim. In denying Mr. Mott the right to a meaningful "split" sample (blood) and meaningful referee testing of that sample, both practically in his case, and by dearth of regulation safeguarding his rights and the rights of others in this regard, coupled with the continuous, intentional and bad faith practice of the defendants in refusing to afford licensees accused of medication violations the right to same, defendants have acted, and continue to act, as state actors and/or under the color of state law.

139.    The Commission is an instrumentality of the state, and each Defendant who is a Commissioner, official or employee is a State actor for purposes of the Fourteenth Amendment and 42 U.S.C. §1983. For at least four decades, Defendant Program has been the statutorily-designated state contracted testing laboratory upon whose services all medication and drug violations of the Commission are formulated and based. The title of the Program aside, by

statutory mandate, all equine drug testing is performed by a state college.[17] Defendant Maylin is the Program's decades-long director and the expert witness upon whom the Commission and its predecessor agency have relied upon, and is tantamount to being the Commission's chief chemist.

140.    The unlawful conduct of Defendants in denying Mr. Mott proper specimen collection, and preservation of that specimen for referee testing, as well the continuous practice of denying accused licensees meaningful split sample testing took place and continues to take place in state offices, the state testing barns of the various pari-mutuel racetracks throughout the state and the state-designated contract laboratory statutorily designated to be and actually maintained at a state college, having a sufficiently close nexus with the state so as to create a "symbiotic relationship to the State."

141.    If the appeal hearing scheduled to be conducted before Commission Hearing Officer Melendez is allowed to proceed, Mr. Mott will suffer irreparable harm to, among other things, his impeccable reputation and ability to rely upon the constitutionally protected property right that he derives from the occupational trainer's license duly issue to him by the Commission and his ability to pursue and practice his chosen profession and livelihood of racing horses that he trains at the highest levels at the racing industry's top venues worldwide. Such harm cannot be adequately compensated by monetary damages. Mr. Mott has no adequate remedy at law or otherwise for the continuing damage and irreparable harm caused by the defendants to his reputation and his ability to pursue his chosen career and livelihood through his property interest in a state-issued occupational license.

---

[17] Racing, Pari-Mutuel Wagering and Breeding Law § 902(1)

142.    A $1,000 fine and the fifteen day suspension of a license continually held for decades might appear to be a minor inconvenience. Yet, it is the penalty itself, and not its length or amount, which is irreparably damaging.

143.    If Mr. Mott is adorned with the irrevocable "Scarlet Letter" of a serious, multiple medication violation, Mr. Mott may not only lose clients (racehorse owners) who desire only a trainer beyond reproach, but may fail to attract countless new ones. Among Mr. Mott's clients have included the likes of the late George Steinbrenner, Kentucky's legendary Claiborne Farms and Pro Football Hall of Famer Bill Parcells. As one of the top thoroughbred racehorse trainers in the country, Mr. Mott attracts owners of substantial stature and means. That attraction will necessarily be seriously debilitated, as important owners will hesitate to retain a 'drug' trainer.

144.    Further, the imposition of the violation and penalty will blemish Mr. Mott's license record. In this regard, Mr. Mott's penalty for any subsequent infractions will undoubtedly come with enhancement, as a licensee's penalty history is invariably a part of the record made by Commission counsel. Further, inasmuch as virtually all racing jurisdictions afford reciprocity to the rulings of coordinate commissions, an assessment of Mr. Mott's character and fitness will be forever tarnished as he seeks license origination and renewals in states, provinces and foreign countries for years to come.

145.    Since the filing of his appeal in late January 2015, Mr. Mott has been afforded a stay of enforcement of the penalty assessed by Defendant, state steward Lewandowski. Since that time he has, as always, acquitted himself ethically, and has since raced numerous horses in multiple jurisdictions without incident, including in the $10 million dollar Dubai World Cup in the United Arab Emirates. Neither the industry, competing horsemen nor the betting public will